**UNITED STATES DISTRICT COURT**
**SOUTHERN DISTRICT OF TEXAS**
**HOUSTON DIVISION**

| | | |
|---|---|---|
| **KAREN A. RITTINGER,** | § | |
| | § | |
| **Plaintiff,** | § | |
| **VS.** | § | **CIVIL ACTION NO. 4:16-CV-639** |
| | § | |
| **HEALTHY ALLIANCE LIFE** | § | |
| **INSURANCE COMPANY; dba** | § | |
| **ANTHEM BLUE CROSS AND BLUE** | § | |
| **SHIELD,** *et al*, | § | |
| | § | |
| **Defendants.** | | |

## MEMORANDUM AND ORDER

Pending before the Court are Defendants' Motion for Summary Judgment (Doc. No. 46) and Plaintiff's Motion for Summary Judgment (Doc. No. 75). After considering the filings and applicable law, the Court finds that the motions should each be granted in part and denied in part.

## I.       BACKGROUND

This case arises under the Employment Retirement Income Security Act of 1974 (ERISA), 29 U.S.C. §§ 1001 *et seq.* Plaintiff Karen Rittinger is a beneficiary, through her husband, of an employee health plan governed by ERISA and offered by Defendant Healthy Alliance Life Insurance Company (HALIC), which does business as Anthem Blue Cross Blue Shield. (Doc. No. 47 at 1–3.) HALIC underwrites the plan, while Defendant Anthem UM Services, Inc., a separate entity, conducts "utilization management review services" for HALIC. (*Id.* at 3 n.2.)

1

On October 15, 2014, Rittinger underwent a laparoscopic surgical procedure known as a "Roux-en-Y gastric bypass" ("RYGB"). (Doc. No. 47 at 6; Doc. No. 76 at 9.) Complications necessitated follow-up surgery on October 18 and intensive care thereafter. (Doc. No. 47 at 7; Doc. No. 69 at 12.) Defendants denied preauthorization for the surgery, though the denial was not issued until October 20. (Doc. No 47 at 6.) As Defendants' denial of coverage explained, "We cannot approve coverage for weight loss surgery (bariatric surgery) or hospital care after this surgery. Bariatric or weight loss surgery is an exclusion in your health plan contract." (App. 628.)[1] A weight loss surgery that Rittinger had received in 1983, the insertion of a "Molina Band," figured in Defendants' denial of coverage. As Defendants explained in their initial denial letter, they construed the October 15 procedure as a simple repetition of the 1983 procedure. (*Id.*)

The crucial language defining the bariatric surgery exclusion is Paragraph 33 in the plan's Health Certificate of Coverage ("Certificate"):

> [The plan does not cover] … bariatric surgery, regardless of the purpose it is proposed or performed. This includes but is not limited to Roux-en-Y (RNY), Laparoscopic gastric bypass surgery or other gastric bypass surgery (surgical procedures that reduce stomach capacity and divert partially digested food from the duodenum to the jejunum, the section of the small intestine extending from the duodenum), or Gastroplasty, (surgical procedures that decrease the size of the stomach), or gastric banding procedures. Complications directly related to bariatric surgery that result in an Inpatient stay or an extended Inpatient stay for the bariatric surgery, as determined by Us, are not covered. This exclusion applies when the bariatric surgery was not a Covered Service under this plan or any previous one of Our Plans, and it applies if the surgery was performed while the Member was covered by a previous carrier/self-funded plan prior to coverage under this Certificate. Directly related means that the Inpatient stay or extend Inpatient stay occurred as a direct result of the bariatric procedure and would not have taken place in the absence of the bariatric procedure. This exclusion does not

---

[1] Defendants submitted the administrative record of Rittinger's case, including her internal appeals, as Exhibit B of the memorandum in support of their summary judgment motion. (Doc. No. 47.) The Court uses the Appendix numbering found in that Exhibit.

apply to conditions including but not limited to: myocardial infarction; excessive nausea/vomiting; pneumonia; and exacerbation of co-morbid medical conditions during the procedure or in the immediate post-operative time frame. (App. 82.)

Paragraph 33's exclusion of complications directly related to bariatric surgery was Defendants' basis for denying coverage of the October 18 procedure, along with another provision generally excluding care for complications from non-covered procedures. (App. 84 ¶ 62.)

On November 21, 2014, Rittinger's husband, Erwin Rittinger, wrote an email to Defendants that set forth a plan to appeal the denial and to submit documents in support. (Doc. No. 76 at 12; App. 567.) Defendants treated the email itself as a formal appeal, acknowledging it as such in a letter dated November 25. (Doc. No. 47 at 7–8; App. 243–44.) A letter from Rittinger's surgeons dated December 2 was submitted to Defendants, and Defendants had one follow-up call with Rittinger or her husband on December 8. (App. 17, 590.) Defendants also obtained an independent peer review by Dr. Julie Kim, a doctor with specialties in general surgery and bariatric surgery. (App. 14–16.) Dr. Kim's review examined the medical care that Rittinger received from October 18 onwards. (App. 14.) The review, conducted on December 18, concluded that the October 18 surgery was due to complications from the initial surgery on October 15 and thus was not covered. (App. 14.) It does not appear that Dr. Kim independently evaluated the denial of coverage for the October 15 surgery. The day after Dr. Kim completed her review, Defendants again denied coverage for Rittinger's surgeries. (App. 19–21.)

In April 2015, Rittinger engaged counsel for a second internal appeal, filing extensive materials about her medical history and the October 2014 surgeries. (Doc. No. 76 at 12–13; App.

247–582.)[2] Rittinger argued, among other points, that the exclusion in Paragraph 33 contained an exception for "excessive nausea/vomiting" that applied to her RYGB surgery on October 15. (App. 265–66.) She supplied records showing that she had long suffered from Gastroesophageal Reflux Disease (GERD), that her condition caused frequent nausea and vomiting, and that she underwent surgery to address these problems. (App. 247–56.)

Defendant Anthem UM Services then convened a "Grievance Advisory Panel" (GAP) to consider Rittinger's appeal. (Doc. No. 47 at 9–10.) Though Rittinger's appeal addressed the initial October 15 surgery and all the care for her complications that followed (App. 247), the GAP's review appeared to focus on the October 18 surgery and subsequent care. (App. 216–18; App. 583–85.) The GAP applied the exclusion in Paragraph 33 and once again denied coverage, explaining its decision to Rittinger in a letter on May 20, 2015. (App. 216–18.) This review yielded Defendants' final decision and exhausted Rittinger's administrative remedies. (App. 217.)

This lawsuit followed. Rittinger has brought five claims for relief against Defendants.[3] (Doc. No. 1.) Count I of her complaint seeks a declaratory judgment that her procedures were covered by her plan and that HALIC is obligated to pay for past and future medical costs. This claim is based on ERISA § 502(a)(1)(B) and § 502(a)(3). 29 U.S.C. § 1132. (Doc. No. 1 at 21–

---

[2] Defendants say that the entire Appendix that they submitted as Exhibit B of their summary judgment motion, Appendix 1 to 630, constitutes the administrative record. (Doc. No. 47 at 2 n.1.) Rittinger contends that various other documents were in the administrative record but omitted from Defendants' Appendix. (Doc. No. 69 at 14.) Because she has not supplied these supposedly omitted documents, the Court accepts Defendants' definition of the administrative record.

[3] Rittinger has used the designation "Count," rather than "claim for relief." Accordingly, the Court will also.

22.) Count II, based on the same statutory provisions, seeks a declaratory judgment that Paragraph 33 of the Certificate is invalid and unenforceable. (*Id.* at 23–24.) Count III, likewise based on the same statutory provisions, alleges breach of the contract to provide benefits. In addition to the denial of benefits, Rittinger also alleges here that Defendants breached the contract "by flagrantly disregarding Plaintiff's internal appellate rights." (*Id.* at 24–25.) Count IV, alleging violations of Missouri insurance law, has been voluntarily dismissed. (Doc. Nos. 35 & 40.) Finally, Count V, based on ERISA § 502(a)(3), alleges that Defendants breached their fiduciary duty in various ways: failure to provide required coverage; failure to investigate; failure to consider Rittinger's internal appeals properly; and others. In connection with this claim, Rittinger asks for an additional civil penalty under ERISA § 502(l)(1)(A). (Doc. No. 1 at 27–28.) In connection with all claims, Rittinger seeks attorney fees under ERISA § 502(g). (*Id.* at 22–28.)

## II.    APPLICABLE LAW

### a.  ERISA

ERISA § 502(a)(1)(B) authorizes a plan beneficiary to bring a civil action "to recover benefits due to him under the terms of his plan, to enforce his rights under the terms of the plan, or to clarify his rights to future benefits under the terms of the plan." 29 U.S.C. § 1132(a)(1)(B). ERISA § 502(a)(3) authorizes a beneficiary to bring a civil action "(A) to enjoin any practice which violates any provision of this subchapter or terms of the plan, or (B) to obtain other appropriate equitable relief (i) to redress such violations or (ii) to enforce any provisions of this subchapter or the terms of the plan." 29 U.S.C. § 1132(a)(3).

ERISA regulations require employee benefit plans to have "a procedure by which a claimant shall have a reasonable opportunity to appeal an adverse benefit determination to an appropriate named fiduciary of the plan, and under which there will be a full and fair review of the claim and the adverse benefit determination." 29 C.F.R. § 2560.503–1(h)(1). Subsequent provisions describe the features that the review must have in order to be "full and fair." Among other requirements, the plan must "[p]rovide for a review that takes into account all comments, documents, records, and other information submitted by the claimant relating to the claim, without regard to whether such information was submitted or considered in the initial benefit determination." § 2560.503–1(h)(2)(iv).

### b. Summary Judgment

In ERISA cases, standard summary judgment rules apply. *Burell v. Prudential Ins. Co. of Amer.*, 820 F.3d 132, 136 (5th Cir. 2016). Summary judgment is appropriate "if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. § 56(a). A genuine dispute of material fact exists when "the evidence is such that a reasonable jury could return a verdict for the nonmoving party." *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986). Summary judgment should be granted against a party "who fails to make a showing sufficient to establish the existence of an element essential to that party's case, and on which that party will bear the burden of proof at trial." *Celotex Corp. v. Catrett*, 477 U.S. 317, 322 (1986). In gauging the existence of genuine disputes, the court must view the evidence in the light most favorable to the nonmoving party and draw all reasonable inferences in its favor. *Carmona v. Southwest Airlines Co.*, 604 F.3d 848, 854 (5th Cir. 2010).

### c. Abuse of Discretion

The Supreme Court has observed that "the validity of a claim to benefits under an ERISA plan is likely to turn on the interpretation of terms in the plan at issue," and so *de novo* review of the plan's interpretation is generally appropriate. *Firestone Tire & Rubber Co. v. Bruch*, 489 U.S. 101, 115 (1989). It recognized, however, that sometimes a plan "gives the administrator or fiduciary discretionary authority to determine eligibility for benefits or to construe the terms of the plan." *Id.* If the plan confers such discretionary authority, then decisions are reviewed for abuse of discretion. *Clayton v. ConocoPhillips Co.*, 722 F.3d 279, 290 (5th Cir. 2013).

Abuse of discretion review "is the functional equivalent of arbitrary and capricious review." *Anderson v. Cytec Industries, Inc.*, 619 F.3d 505, 512 (5th Cir. 2010). "A decision is arbitrary if it is made without a rational connection between the known facts and the decision," and a decision to deny benefits "must be supported by substantial evidence." *Id.* (cleaned up). "Substantial evidence is more than a scintilla, less than a preponderance of relevant evidence, and is such relevant evidence as a reasonable mind might accept as adequate to support a conclusion." *Corry v. Liberty Life Assurance Co. of Boston*, 499 F.3d 389, 398 (5th Cir. 2007) (citation omitted). This review is deferential. It "need not be particularly complex or technical; it need only assure that the administrator's decision fall somewhere on a continuum of reasonableness—even if on the low end." *Burell*, 820 F.3d at 140 (quotation omitted). To reach that low end, there must nevertheless be "some concrete evidence in the administrative record that supports the denial of the claim." *Vega v. Nat'l Life Ins. Servs., Inc.*, 188 F.3d 287, 302 (5th Cir. 1999) (en banc), *overruled on other grounds by Metropolitan Life Ins. Co. v. Glenn*, 554 U.S. 105 (2008).

When reviewing an administrator's interpretation of plan terms, a court first determines whether the administrator's interpretation is "legally correct." *LifeCare Mgmt. Servs. LLC v. Ins. Mgmt. Adm'rs Inc.*, 703 F.3d 835, 841 (5th Cir. 2013) (citation omitted). In assessing the correctness of the administrator's interpretation, the court should consider whether the administrator gave the plan a "uniform construction," whether it is a "fair reading of the plan," and whether "unanticipated costs" result from different interpretations. *Id.* The "most important factor" is whether the reading is fair. *Id.* If the administrator's interpretation is incorrect, the court should then consider whether it constitutes an abuse of discretion. *Id.* (citing *Gosselink v. Amer. Tel. & Tel., Inc.*, 272 F.3d 722, 726 (5th Cir. 2001), for various factors the court should weigh). A reading that "directly contradicts the plain meaning of the plan language" constitutes an abuse of discretion. *Id.*

When reviewing benefits decisions, "courts generally cannot consider evidence outside the administrative record." *Anderson*, 619 F.3d at 515–16. "If the claimant submits additional information to the administrator, and requests the administrator to reconsider its decision, that additional information should be treated as part of the administrative record." *Estate of Bratton v. Nat'l Union Fire Ins. Co. of Pittsburgh, PA*, 215 F.3d 516, 521 n.5 (5th Cir. 2000). The court may sometimes look beyond the administrative record—for instance, to evidence of the administrator's decisions in other cases, or for expert opinion to aid the court's understanding of medical concepts—but not as a matter of course. *Id.* at 215.

### III. ANALYSIS

The central issue in this case is whether Defendants abused their discretion in their internal appeals process, either by inappropriately categorizing communications with Rittinger

and her husband as a formal appeal or by improperly denying coverage once Rittinger had fully added to the administrative record. Rittinger also seeks relief based on other theories, however, which the Court addresses before considering Defendants' alleged abuses of discretion.

### a. Breach of Fiduciary Duty

Defendants argue that Count V of Plaintiff's Complaint, breach of fiduciary duty, is duplicative of Count III, her denial of benefits claim. Count V seeks the same relief as Count III, reimbursement for medical bills and costs, so Defendants assert that it should be dismissed. (Doc. No. 47 at 21–23.) Defendants cite *Varity Corp. v. Howe*, 516 U.S. 489, 510–15 (1996), which said that ERISA fiduciary duty claims are just a "safety net," available only when other ERISA provisions will not grant relief. (Doc. No. 47 at 22.) Defendants also cite, as illustration, *Rusch v. United Health Group, Inc.*, 2013 WL 3753947, at *11 (S.D. Tex. July 15, 2013). In *Rusch*, the court dismissed a fiduciary duty claim as duplicative because its substance was nothing more than a denial of benefits claim. *Id.*

Rittinger does not address Defendants' duplication argument in her Response (Doc. No. 69), nor in the filings for her own summary judgment motion. (Doc. Nos. 76 & 79.) Defendants urge the Court to view her lack of response as a concession, sufficient to rule for Defendants on this point. (Doc. No. 74 at 10.) The Court also observes that the relief sought in Count V duplicates the relief sought in Count III and that the conduct constituting breach alleged in Count V is covered by the other counts. (Doc. No. 1 at 22–28.) Accordingly, dismissal of Count V is appropriate.[4]

---

[4] The dismissal of Count V also dispenses with Rittinger's request for an additional civil penalty

### b. Facial Invalidity of Paragraph 33

Rittinger argues that Paragraph 33 is facially invalid because it contains the phrase "as determined by Us," which renders the paragraph ambiguous and illusory. (Doc. No. 69 at 23; Doc. No. 76 at 21.) In her view, the usage of the term "bariatric" in Paragraph 33 should act as a limit on Defendants' ability to exclude services from coverage. It cannot limit Defendants' discretion to exclude services, however, if Defendants possess unfettered discretion to determine the meaning of "bariatric."

This argument has three flaws. First, the phrase "as determined by Us" appears in a sentence midway through the paragraph about covering complications related to bariatric surgery. (App. 82.) ("Complications directly related to bariatric surgery that result in an Inpatient stay or an extended Inpatient stay for the bariatric surgery, as determined by Us, are not covered.") The phrase does not clearly apply to the rest of the paragraph, so it does not necessarily alter the meaning of Paragraph 33's general rule—the exclusion of bariatric surgeries. Second, even if it altered the entire paragraph's meaning, courts have rejected the argument that "as determined by us" or equivalents make a plan's terms ambiguous, much less unenforceable. *See Loyola Univ. of Chicago v. Humana Ins. Co.*, 996 F.2d 895, 899 (7th Cir. 1993); *Sven v. Principal Mut. Life Ins. Co.*, 1996 WL 539109, at *4–5 (N.D. Ill. Sept. 20, 1996). Plaintiff provides no contrary case law. Third, even if the phrase rendered the paragraph's core principle ambiguous, the paragraph nevertheless specifically mentions the procedure that

under ERISA § 502(l). Whether or not Rittinger's breach of fiduciary claim should survive, this request would not. The statute indicates that only the Secretary of Labor can seek such penalties, as Defendants have noted. (Doc. No. 47 at 23 n.7.)

Rittinger underwent—Roux-en-Y gastric bypass. There is no question that the paragraph generally excludes that procedure.

This theory of Paragraph 33's facial invalidity appears to be the sole basis for Count II of Rittinger's complaint. (Doc. No. 1 at 23–24.) Consequently, dismissal of Count II is appropriate.

### c. Equitable Estoppel

Rittinger argues that, regardless of Paragraph 33's interpretation, Defendants should be equitably estopped from denying coverage of her surgeries because they "were aware of and covered essentially all of Plaintiff's nausea, vomiting, and GERD-related health care costs going back at least until 2005, if not many years earlier." (Doc. No. 69 at 25; *see also* Doc. No. 76 at 23–24.)

"To establish an ERISA-estoppel claim, the plaintiff must establish: (1) a material misrepresentation; (2) reasonable and detrimental reliance upon the representation; and (3) extraordinary circumstances." *Mello v. Sara Lee Corp.*, 431 F.3d 440, 444–45 (5th Cir. 2005). Though Rittinger had been covered by Defendant HALIC since 2005 (App. 476–77), Defendants note that Rittinger has not specifically identified any previous claims for excessive nausea or vomiting that were paid. (Doc. No. 74 at 9.) Because nothing in the record shows the basis for any reliance by Rittinger, her estoppel theory fails.

### d. Conflict of Interest

Rittinger argues that Defendants have a serious conflict of interest because the plan funder and the plan administrator are linked through the common ownership of Anthem, Inc., and through common executive management. (Doc. No. 69 at 3–5; Doc. No. 76 at 7–8 n.1.) The

11

Supreme Court has held that a conflict exists when "a plan administrator both evaluates claims for benefits and pays benefits claims." *Metropolitan Life Ins. Co. v. Glenn*, 554 U.S. 105, 112 (2008). A court should take such a conflict into account when determining whether there was an abuse of discretion. *Id.* at 115. It may "act as a tiebreaker when the other factors are closely balanced." *Id.* at 117. Rittinger urges that this factor should tip the balance in her favor if the abuse of discretion analysis that follows turns out to be a close call. (Doc. No. 76 at 7–8 n.1.)

"An ERISA plaintiff asserting a conflict of interest must come forward with evidence of the existence and extent of the conflict." *Ariana M. v. Humana Health Plan of Tex., Inc.*, 163 F. Supp. 3d 432, 439–440 (S.D. Tex. 2016) (Rosenthal, J.). If such a conflict exists, various considerations bear on the weight that it should receive in the abuse of discretion analysis. On the one hand, "a history of biased claims administration" and "procedural unreasonableness" would make the conflict more meaningful; on the other, "active steps to reduce potential bias and to promote accuracy" would make it less so. *Glenn*, 554 U.S. at 117–18. If a plaintiff "has failed to point to anything in the record that indicates [the plan's] conflict of interest actually affected the denial of [her] claim," however, a court should not accord this factor any weight. *Burell*, 820 F.3d at 139.

As noted, Rittinger's conflict of interest argument is predicated on HALIC and Anthem UM's common parent, Anthem, Inc., and common executive management. (Doc. No. 69 at 3–5; Doc. No. 76 at 7–8 n.1.) Defendants do not appear to contest that HALIC and Anthem UM have overlapping executive management or common ownership, but they nevertheless assert that Rittinger has not demonstrated a conflict of interest that directly affected her case. (Doc. No. 74 at 3–4; Doc. No. 78 at 10.) Defendants point out that Rittinger has shown no evidence of any "financial influences" between HALIC and Anthem UM. (Doc. No. 78 at 10–11.) They also note

that they relied on an outside entity, Advanced Medical Reviews, to evaluate its denial of coverage and Rittinger's first appeal. (*Id.* at 11; App. 14–16.)

Defendants' common ownership and management do indicate the potential existence of a structural conflict of interest. *Cf. Burell*, 820 F.3d at 139. But Rittinger must show more than that. Finding that Rittinger has not demonstrated that Defendants' common ownership and management "actually affected the denial of [her] claim," *id.*, and that Defendants have undertaken at least some measures to reduce bias, the Court does not incorporate Defendants' conflict of interest into the abuse of discretion analysis that follows.

The Court observes that the Supreme Court and Fifth Circuit have recognized that "procedural unreasonableness" could inform the weight that a trial court gives to a plan administrator's conflict of interest. *Glenn*, 554 U.S. at 118; *Burell*, 820 F.3d at 139. The Court also observes that Rittinger has alleged many flaws in Defendants' internal appeals procedures. Rittinger has not, however, argued that the alleged procedural shortcomings should confer greater importance on Defendants' conflict of interest. Accordingly, the Court also declines to incorporate this consideration into the following discussion.

### e. Abuse of Discretion in First Appeal

Rittinger argues that Defendants abused their discretion by treating an email from Rittinger's husband, Erwin, on November 21, 2014 as her first formal appeal and by denying it before Rittinger could assemble all her materials and make a strong case. (Doc. No. 69 at 16–18; Doc. No. 76 at 15–16.) That email, addressed to a Kathy Herrer, reads as follows:

> Attached is the Medical Power of Attorney allowing me to speak on behalf of my wife Karen Rittinger. I would like to file an appeal for her hospitalization which began on 10/15/2014. I am in the process of obtaining additional documentation from the physician who performed the initial surgery on Karen for her reflux

problems that was [sic] causing her a great deal of suffering. Karen has had reflux problems for many years. She disclosed this on her initial enrollment form with Anthem in 2005. Anthem has covered the claims for this condition since that time to the present. The surgery she had was necessary to treat her reflux problems. Her reason for seeing Dr. Davis was not weight loss but a condition that was making it almost impossible for her to eat. I find it difficult to imagine that a surgery Karen had more than 30 years ago was responsible for her current problems especially since her reflux claims have been covered all this time by Anthem. (App. 567.)

Rittinger contends that her husband was merely stating the intent to file an appeal, not formally initiating one. (Doc. No. 69 at 16.) Moreover, she argues that this email should not have been treated as an appeal because it did not conform to the submission requirements as stated in the Certificate. (*Id.* at 16–17; App. 118–19) The Certificate instructs beneficiaries on filing a "First Level Appeal" and a "Second Level Appeal." (App. 118–19.)[5] First Level Appeals must be initiated by mailing a letter to a specified post office box. (*Id.*) The Certificate does not provide an email address for submissions. (*Id.*) In Rittinger's view, treating her husband's email as a formal appeal "effectively negat[ed]" her right to a First Level Appeal under the Certificate. (Doc. No. 76 at 16.)

Defendants contend that an email is a form of "written" submission. (Doc. No. 47 at 24.) They treat it as such because it enables quick responses to their customers, and to insist on strict compliance with submission requirements would be unfair to customers in desperate straits. (Doc. No. 84 at 12.) They also claim that their initial denial of coverage on October 20, 2014 provided an electronic submission option for appeals. (Doc. No. 47 at 24; App. 12.) They add that "Rittinger even characterized the e-mail as an appeal in follow up conversations with

---

[5] The Certificate also provides an "Expedited Appeal Review," but neither side contends that Defendants treated Erwin Rittinger's email as one.

Defendants and her attorney admitted this in the second appeal he filed on her behalf." (Doc. No. 47 at 24–25, citing App. 256.) Finally, they contend that Rittinger's second appeal was counseled and got full consideration, so Rittinger experienced no harm. (*Id.*)

The Court must determine whether Defendants made a legally correct interpretation of the plan terms and, if not, whether the incorrect interpretation constitutes an abuse of discretion. Rittinger is right that the First Level Appeal instructions in the certificate do not provide an email submission option. Defendants' argument that their initial denial of coverage provided one misses the mark. That letter did say that Rittinger "may send [her] request electronically at www.Anthem.com." (App. 12.) That option is absent from the Certificate, however, and in any event, it is not clear that Erwin Rittinger used it. His email went to a specific Anthem employee, Karen Harrer, and Defendants do not identify a connection between her and the email submission option. The Court thus finds that Defendants' interpretation reads the plan terms unfairly. Consequently, it is not legally correct.

Whether the interpretation constitutes an abuse of discretion is a different question. Defendants' claim that Rittinger characterized the email as an appeal in subsequent conversations is unfounded. In support of this claim, Defendants cite the brief that Rittinger's counsel filed in her April 2015 internal appeal, and it simply does not substantiate Defendants' assertion. (App. 256.) Defendants' argument that Rittinger got another, more thorough appeal afterwards is similarly unhelpful to their position. A beneficiary entitled to two full appeals is harmed if one appeal is given short shrift, even if the other is not.

Defendants' explanation that they meant only to respond quickly to a customer's request is more persuasive. Erwin Rittinger's wording—"I would like to file an appeal"—can be interpreted as a request to initiate an appeal just as readily as an expression of the intent to later

file one. In addition, the Court can well imagine the perils of permitting insurers to shut out customers who do not dot every "i" and cross every "t" in a complex submission process. Of course, Defendants' quick response did not redound to this customer's benefit. Nevertheless, the Court cannot conclude that Defendants abused their discretion by treating Erwin Rittinger's email as the initiation of a formal appeal.

### f. Abuse of Discretion in Second Appeal

The remaining, and central, dispute is Defendants' decision to not apply the exception for "excessive nausea/vomiting" based on the administrative record of the April 2015 appeal. Rittinger contends that Defendants abused their discretion by ignoring her relevant evidence and failing to apply the exception in Paragraph 33 for nausea and vomiting. (Doc. No. 69 at 20; Doc. No. 76 at 18.) Defendants argue that Rittinger's surgery was for the purpose of weight loss and that "pre-surgical medical records explaining the purpose of the [October 15, 2014] surgery expressly indicate that she did not have vomiting or nausea." (Doc. No. 47 at 14.)

Alongside this factual dispute is an interpretive dispute. Defendants concede that Rittinger "underwent the surgery to also address GERD and esophagitis," if not to address nausea and vomiting, but they insist that "the surgery was plainly also for weight loss." (Doc. No. 78 at 14.) Defendants interpret Paragraph 33 to exclude a bariatric surgery if weight loss is among its purposes, even if evidence shows that addressing other health conditions is too. (*Id.*) Therefore, the Court must look for abuse of discretion both in Defendants' interpretation of plan terms and in Defendants' ultimate decision to deny coverage, bearing in mind what a reasonable jury could decide.

To recall the salient provision of Rittinger's health plan, Paragraph 33 states that the plan does not cover "bariatric surgery, regardless of the purpose it is proposed or performed," including the "Roux-en-Y (RNY), Laparoscopic gastric bypass surgery" that Rittinger underwent on October 15, 2014. (App. 82.) "Complications directly related to bariatric surgery" are also not covered. (*Id.*) These exclusions do not apply, however, "to conditions including but not limited to . . . excessive nausea/vomiting . . . ." (*Id.*)

The Court begins with the interpretation of these plan terms. In Defendants' view, Rittinger's purported weight loss goal is determinative. Despite acknowledging Rittinger's GERD and esophagitis, they argue that Rittinger's "surgery was plainly also for weight loss and such surgeries are excluded from coverage." (Doc. No. 78 at 14.) Defendants rely here on *Wilson v. Blue Cross and Blue Shield of Tex.*, 2017 WL 1215430 (S.D. Tex. Mar. 31, 2017) (Atlas, J.). In *Wilson*, the court affirmed the denial of coverage to a beneficiary whose bariatric surgery was ostensibly to address reflux and esophagitis, not weight loss. *Id.* at *1, *7–8, *12.

The factual similarities between *Wilson* and the present case are undeniable, but the plan at issue in *Wilson* had meaningfully different terms. That plan excluded "[a]ny services or supplies for reduction of obesity or weight, including surgical procedures, even if the Participant has other health conditions which might be helped by a reduction of obesity or weight." *Id.* at *1. There is a key difference between this provision and Paragraph 33. The *Wilson* provision expressly excludes surgeries with health benefits in addition to obesity reduction. Paragraph 33 does not do this. Rather than exclude bariatric surgeries addressed to health conditions beyond obesity, Paragraph 33 clearly contemplates covering such cases. Its exception lists various scenarios involving other health conditions, including "excessive nausea/vomiting." Given that

all bariatric surgeries involve obesity,[6] the clear effect of Paragraph 33's exception is to provide coverage to surgeries addressing both obesity and the listed health conditions.

As the comparison to *Wilson* shows, Defendants' interpretation of Paragraph 33 would render its exception meaningless. In their letters to Rittinger and their briefing, Defendants use the terms "bariatric surgery" and "weight loss surgery" interchangeably. (Doc. No. 47 at 6–7.) If all bariatric surgeries are weight loss surgeries, and any connection to weight loss causes a surgery to be excluded, it is impossible to imagine the bariatric surgery that Paragraph 33 would not exclude, no matter the other health conditions at which it might be aimed. Consequently, the Court concludes that Defendants' interpretation of Paragraph 33 is legally incorrect and contrary to the provision's plain meaning.

The Fifth Circuit has said that an interpretation contradicting plan terms' plain meaning constitutes an abuse of discretion. *LifeCare Mgmt. Servs.*, 703 F.3d at 841. The Court does not view this as sufficient to establish an abuse of discretion in this case, however. The administrative record must show that Rittinger qualified for the "excessive nausea/vomiting" exception; otherwise, Defendants' interpretation of Paragraph 33's exception is immaterial to this case. The administrative record for Rittinger's April 2015 appeal is therefore the Court's next focus. Because the Court's review is limited to this administrative record, a catalogue of its precise contents is essential.

In her personal declaration, Rittinger said that she began to experience involuntary vomiting in the 1990's and started receiving treatment for GERD and nausea problems. (App.

---

[6] Defendants treat the terms "bariatric surgery" and "weight loss surgery" as synonyms. (Doc. No. 47 at 6–7.) Rittinger does not disagree, defining "bariatric" as "relating to or specializing in the treatment of obesity." (Doc. No. 69 at 24.)

462.) Her difficulties reached "the point of intolerability" in 2014, which led eventually to her RYGB surgery that October aimed at "alleviating [her] unbearable GERD symptoms." (App. 463.) Rittinger corroborated her long-running health problems with a letter from Dr. Keith Starke and declarations from two friends. Dr. Starke said that he had treated Rittinger for "reflux esophagitis"[7] from the 1990's to 2009. (App. 466.) Rittinger's friends, Donna Bogy and Alice Arnold, declared that they had personal knowledge of Rittinger's frequent difficulty with involuntary vomiting. (App. 468–71.) Arnold attributed this to Rittinger suffering "badly" from gastric reflux. (App. 471.)

In her declaration, Rittinger said that she was seen by Dr. David Richards. (App. 463.) Dr. Richards submitted a letter saying that, when he saw her on June 23, 2014, she presented "a history of GERD and esophagitis" and complaints of "difficulty with swallowing and regurgitation." (App. 480.) Dr. Richards connected these problems to the gastric band procedure that Rittinger underwent in 1983. (*Id.*) Dr. Richards had Rittinger undergo an esophagram that day and an esophagogastroduodenoscopy,[8] or EGD, the next day, after which he recommended surgery. (*Id.*)

After Dr. Richards, Rittinger was seen by Dr. Robert Davis of the Davis Clinic, who performed the surgery on October 15. (App. 464.) The Davis Clinic did an intake exam of Rittinger on September 15, 2014, and the intake report indicates that Rittinger presented "morbid

---

[7] Defendants define esophagitis as "an inflammation of the lining of the esophagus." (Doc. No. 47 at 9.)

[8] Defendants say that this procedure is "not only used to diagnose nausea and vomiting, but is also used to diagnose GERD, esophagitis, and gastritis." (Doc. No. 78 at 18.)

obesity," "abdominal pain," and GERD. (App. 560–63.)[9] She also signed a consent form that day for an examination of her esophagus and stomach. (App. 582.) The form noted her reflux problem, some sort of obstruction, and the presence of the Molina Band implanted in 1983. (*Id.*)

Dr. Davis and a colleague, Dr. Anthony Primomo, submitted a letter for Rittinger's appeal. In the letter, the surgeons said that "the main indication for surgery was chronic gastric obstruction with severe unremitting gastro-esophageal reflux." (App. 565.) Rittinger's "main complaint" was "severe persistent gastro-esophageal reflux with nausea and vomiting that had become resistant to medical therapy." (*Id.*) Her health problems had left her "unable to eat solid food" and suffering from "epigastric pain and discomfort." (*Id.*) According to the surgeons, radiology showed a "gastric obstruction" and a "poorly contracting esophagus," for which the appropriate treatment was "surgical excision of the obstructed area with reconstruction by a Roux-en-Y bypass." (*Id.*)

To support her assertion that GERD and its harmful consequences were the impetus for her surgery, Rittinger supplied her hospital records from Memorial Hermann, where the surgery was performed. Her anesthesia record said that her diagnoses were GERD and "complication of internal device." (App. 574.) The hospital's surgical pathology report indicated the same information, along with her esophagitis diagnosis. (App. 576.) The hospital's pre-operative preparation form did the same. (App. 578.)

To support her argument that laparoscopic RYGB surgery is used to address health problems like hers, not just weight loss, Rittinger included medical literature in her April 2015

---

[9] Other contents of this document are important to Defendants' case, discussed below.

appeal. She submitted six articles, either in full or abstract form, on the treatment of GERD and its harms through gastric bypass surgery. (App. 482–526, 528, 530–41, 543, 545, 548–52.)

Taken together, the declarations, doctors' letters, medical records, and scholarly literature tell a coherent story. Rittinger suffered from GERD and esophagitis. These conditions caused severe discomfort, which included recurring nausea and vomiting. These problems were caused or exacerbated by her obesity and by the gastric band on Rittinger's stomach implanted in 1983. Doctors concluded that surgery would address the causes of Rittinger's nausea, vomiting, and other discomfort. Specialists selected laparoscopic RYGB surgery. A substantial medical literature buttressed their conclusion. The remediation of her discomfort, not simple weight loss, was Rittinger's main desire and her doctors' main aim.

Rittinger contends that Defendants ignored this account of her surgery. (Doc. No. 76 at 18.) Indeed, Defendants' initial coverage denial (App. 627–28), December 2014 denial (App. 19–21), and May 2015 denial (App. 216–18) do not mention the "excessive nausea/vomiting" exception to her plan's exclusion of bariatric surgery or acknowledge Rittinger's relevant evidence. As Defendants note, however, "a plan administrator is only required to state the specific reasons for denying the claim," but not "to rebut specifically all evidence that the claimant offers." *Leake v. Kroger Texas, L.P.*, 2006 WL 2842024, at *9 (N.D. Tex. Sept. 28, 2006) (citing *Kent v. United of Omaha Life Ins. Co.*, 96 F.3d 803, 807 (6th Cir. 1996); *Militello v. Central States, Se. & Sw. Areas Pension Fund*, 360 F.3d 681, 689 (7th Cir. 2004)). Relatedly, the Court is mindful of the Fifth Circuit's admonition that "procedural unreasonableness" is "not an independent basis for finding an abuse of discretion." *Burell*, 820 F.3d at 139. Defendants' failure to acknowledge and explain away the "excessive nausea/vomiting" exception in its letters to Rittinger is thus not a basis for finding that Defendants' abused their discretion.

That failure does leave it unclear, however, why Defendants concluded that the nausea and vomiting exception did not apply. In the absence of contemporaneous explanations, the Court must look elsewhere for assurance that Defendants' conclusion proceeded from substantial evidence and not capriciousness. The deliberations of the Grievance Advisory Panel, which ruled on Rittinger's April 2015 appeal, do not provide that assurance. The GAP records contain one paragraph of analysis. (App. 583–86.) The GAP's analysis is limited to categorizing the procedure that Rittinger underwent. It notes only that Rittinger's October 15 procedure was bariatric, that complications from that procedure were the cause of her subsequent care, and that her plan generally excluded such coverage. Though the GAP quotes the text of Paragraph 33, including the "excessive nausea/vomiting" exception, the GAP's analysis does not address the exception. It does not consider any of the relevant evidence that Rittinger submitted. It does not explain its failure to do so.

Defendants rely heavily on the aforementioned intake report that the Davis Clinic produced on September 15, 2014, one month before the surgery. (Doc. No. 47 at 14; App. 612–14.) This document reports "no vomiting" and "no nausea" among Rittinger's symptoms. (Doc. No. 47 at 14; App. 613.) It also reports the following "History of Present Illness":

> Ms. KAREN RITTINGER is a 61 year old female with severe morbid obesity, for which she has had greater than five years. [sic] She presents with a central / android obesity. Ms. RITTINGER was in the office today to be evaluated for a weight loss surgical procedure. She had a Molina band in 1983 and lost about 100lb but it was too tight and she had to have it loosened.[10] More recently she has been gaining a significant amount of weight and reflux. Her symptoms improved

---

[10] The administrative record indicates that this loosening occurred in 1984. (App. 620.)

after she had an endoscopy which showed a dilated proximal pouch with band narrowing.[11] (App. 612.)

Though the text mentions Rittinger's reflux and alludes to other symptoms, it lends credence to Defendants' weight loss interpretation of her RYGB surgery. In addition to relying on this intake report, Defendants point to the "Review Request for Surgery for Clinically Severe Obesity" that Dr. Davis submitted to Anthem UM in advance of the surgery. (Doc. No. 47 at 5; App. 608–09.) This document also notes Rittinger's Molina Band surgery in 1983, indicating that Rittinger lost 100 pounds but regained most of it. (App. 609.) Defendants add that there are distinct "diagnosis codes for GERD, nausea, and vomiting," and that Rittinger has shown no usage of those codes in her records. (Doc. No. 74 at 8.)

In response, Rittinger discounts the "no nausea" and "no vomiting" text in the intake report, arguing that the report was a snapshot, meant "to record the routine slate of a patient's slice-of-time vital signs." (Doc. No. 79 at 2; App. 613.) For instance, it also reported "no fever present" and "no rash present." Further supporting that interpretation, the intake report also said that she felt no abdominal pain one page after recording abdominal pain among her chief complaints. (App. 612–13.) Concerning the diagnosis codes, Rittinger counters that Dr. Davis's pre-operative request for Anthem UM to review the proposed surgery employs a code for GERD. (Doc. No. 69 at 15; App. 608.) Moreover, the Memorial Hermann hospital records identify GERD and esophagitis among her diagnoses.

Defendants offer various reasons to discredit Rittinger's evidence. They argue that the declarations of Rittinger and her friends, Bogy and Arnold, are "post hoc" and "self-serving."

---

[11] This presumably refers to the procedure conducted on June 23, 2014 that Dr. Richards noted in his letter.

(Doc. No. 47 at 9 n.5.) They discredit those declarations also because they arrived "long after the fact and for the very first time" in the April 2015 appeal. (*Id.* at 9.) They dispute the significance of Dr. Richards' letter because it did not mention nausea or vomiting. (*Id.*) They also dispute the significance of the letter from Drs. Davis and Primomo because it lacked supporting medical records, did not say when the symptoms began, and arrived only after the surgery was conducted and coverage was denied. (*Id.* at 8, 14.) They would disregard the surgeons' letter altogether, on the grounds that it was a retraction or contradiction of their pre-surgery judgment. (*Id.* at 14.) Concerning the evidence of Rittinger's GERD and esophagitis, Defendants observe that "GERD and esophagitis are not exceptions to the Exclusion" in Paragraph 33. (Doc. No. 78 at 14.) Only excessive nausea and vomiting are.

Some of these reasons are persuasive. There is no doubt that the declaration of a plan beneficiary seeking coverage is self-serving, and her friends' declarations are scarcely more disinterested. Defendants also identify important limitations of the letter from Drs. Davis and Primomo. Their rationale for disregarding the letter altogether, however, is not persuasive. It is not a retraction or contradiction of Dr. Davis's and Dr. Primomo's pre-surgery judgments. It would appear so only based on a selective reading of the September 15 intake report, but that report also listed GERD and abdominal pain among Rittinger's chief complaints, consistent with the surgeons' post-surgery letter.

Defendants' other reasons for discrediting Rittinger's evidence are also not persuasive. Despite the late arrival of Rittinger's declarations, ERISA regulations obligate Defendants to consider them. *See* § 2560.503–1(h)(2)(iv). Contrary to Defendants' assertion, Dr. Richards' letter does allude to vomiting, using the phrase "difficulty . . . with regurgitation." (App. 480.) Likewise, Defendants' effort to separate GERD and esophagitis from nausea and vomiting is

sophistic. Rittinger's view is that the former contribute to the latter. Defendants' view appears to be that the latter must occur *sua sponte*, and cannot be attributed to underlying conditions.

After the clash of adversarial argument, the following general points are left standing. Bariatric RYGB surgery is used for purposes other than weight loss. Those purposes include the treatment of GERD and esophagitis. The harmful consequences of these conditions include nausea and vomiting. The remaining evidence, interpreted in the light most favorable to Rittinger, indicates that her GERD and esophagitis were accompanied by nausea and vomiting and that doctors recommended and administered RYGB surgery to solve those problems.

Interpreting the evidence in the light most favorable to Defendants produces the following best case. Rittinger wanted to get weight loss surgery to address her severe obesity. She had other health conditions, but those were ancillary concerns. She expressed her wish for weight loss to her doctors, who understood her desires. Only after the surgery went wrong, after Defendants denied coverage, and after Rittinger glimpsed the nausea/vomiting exception in Paragraph 33 did she play up her other health conditions. What evidence she has of nausea and vomiting was assembled only from this point onwards, from untrustworthy sources.

But this best case still relies on Defendants' aforementioned erroneous interpretation of Paragraph 33. If Rittinger's April 2015 appeal established the existence of excessive nausea and vomiting, the apparent effort also to lose weight would not exclude her surgery from coverage. The latter might well be central to addressing the former.

Rittinger still has the following in her favor: corroborated personal accounts of nausea and vomiting (albeit self-interested); three disinterested doctors attributing her surgery in part to nausea and vomiting caused by GERD and esophagitis; pre-surgery medical records indicating her reflux problems; and an unrebutted scholarly literature linking this evidence together.

Defendants' attempts to discredit this evidence do not themselves constitute substantial evidence that the "excessive nausea/vomiting" exception was inapplicable to Rittinger. Defendants also lack evidence of their own that justifies not applying the exception. In Fifth Circuit decisions upholding denials of coverage, plan administrators have stronger evidence than this. Such cases typically feature the proverbial battle of the experts, with some medical experts favoring the beneficiary and others favoring the plan administrator. *E.g.*, *Burell*, 820 F.3d at 135–39; *Anderson*, 619 F.3d at 513–15; *Corry*, 499 F.3d at 398–402; *Gothard v. Metropolitan Life Ins. Co.*, 491 F.3d 246, 248–50 (5th Cir. 2007). On a mixed record, the Fifth Circuit recognizes that the plan administrator has a "permissible choice" between competing theories. *Burell*, 820 F.3d at 139. Rittinger's dispute with Defendants more resembles a different Fifth Circuit decision, where it ruled against a plan administrator and said the following:

> Plainly put, we will not countenance a denial of a claim solely because an administrator suspects something may be awry. Although we owe deference to an administrator's reasoned decision, we owe no deference to the administrator's unsupported suspicions. Without some concrete evidence in the administrative record that supports the denial of the claim, we must find the administrator abused its discretion.

*Vega*, 188 F.3d at 302. Along with their legally incorrect interpretation of Paragraph 33, Defendants lack the substantial evidence that they must have for their decision to not apply the exception for nausea and vomiting. The result is an arbitrary and capricious decision, constituting an abuse of discretion.


## IV.    CONCLUSION

The Court finds that Defendants Healthy Alliance Life Insurance Company and Anthem UM Services, Inc., are entitled to summary judgment on the following: Count II of Plaintiff Karen Rittinger's complaint, arguing for the invalidity of Paragraph 33; Counts I and III, as they

concern the coverage denial rendered in December 2014; and Count V, her breach of fiduciary duty claim. In addition, the Court finds that Defendants are not entitled to summary judgment on the coverage denial rendered in May 2015. Defendants' Motion for Summary Judgment (Doc. No. 46) is therefore **GRANTED IN PART** and **DENIED IN PART**.

The Court also finds that Plaintiff is not entitled to summary judgment on the following: Count II; Count V; and Counts I and III as they concern the coverage denial rendered in December 2014. Plaintiff is entitled to summary judgment on the coverage denial rendered in May 2015, addressed in Counts I and III of her complaint. Plaintiff's Motion (Doc. No. 75) is therefore **GRANTED IN PART** and **DENIED IN PART**.

Accordingly, the Court declares that Plaintiff is entitled to full coverage under the plan administered by Defendants of her surgeries in October 2014 and her resulting care. Plaintiff is also entitled to a reasonable attorney's fee and costs of action under ERISA § 502(g)(1), upon a motion supported by proper documentation.

**IT IS SO ORDERED.**

**SIGNED** at Houston, Texas, on this the 14th day of September, 2017.


KEITH P. ELLISON
UNITED STATES DISTRICT JUDGE